Filed 9/2/22 Certified for Publication 9/28/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RICKY LEE MILLER, JR., | C090751 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2017-00207092-CU-PO-GDS) |
| v. | |
| ROSEVILLE LODGE NO. 1293 et al., | |
| Defendants and Respondents. | |

This case involves application of the so-called *Privette* doctrine, which deals with whether an entity that hires an independent contractor can be liable for on-the-job injuries sustained by the independent contractor's workers. Under the *Privette* doctrine, the answer is no, unless an exception applies.

Defendant and respondent Roseville Lodge No. 1293, Loyal Order of Moose, Inc. (the Lodge) hired Charlie Gelatini to move an automated teller machine (ATM) on its premises. Plaintiff and appellant Ricky Lee Miller, Jr., worked for Gelatini and was the person who performed the work. Miller was injured on the job when he fell from a

1

scaffold, and he seeks to hold the Lodge and its bartender John Dickinson liable for his injuries. Citing the *Privette* doctrine, the Lodge and Dickinson argued they are not liable, and they moved for summary judgment. Miller argued triable issues of fact exist over whether an exception applies. The trial court granted the motion, and Miller appealed. We now affirm.

## I

## FACTUAL AND PROCEDURAL BACKGROUND

Gelatini owns Tri-Valley Amusement, Inc. (collectively Gelatini). Miller worked part time for Gelatini installing, upgrading, repairing, maintaining, and cleaning ATM's. Gelatini was the point of contact with the customer, and about 40 percent of the time he would be at the job site with Miller. Gelatini would tell Miller what needed to be done, and Miller would complete the work. Miller was working for Gelatini at the time of the incident and considered himself to be Gelatini's employee.[1]

Gelatini was hired by the Lodge to relocate an ATM. On the day of the incident, Gelatini and Miller arrived at the Lodge without a ladder. They walked inside the Lodge and saw a scaffold up against one of the walls near the bar area. Dickinson was the only

---

[1] There is a hint in Miller's brief that there may be a dispute over whether he was Gelatini's employee or was an independent contractor. However, neither party directly addresses this issue in their briefs, and assuming there is such a dispute, we find it to be immaterial because the *Privette* doctrine applies whether the injured worker is an employee or is himself an independent contractor, and Miller does not suggest otherwise. (See, e.g., *Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 270 & fn. 2 [doctrine applies when " 'contract worker' " is injured on the job, and " 'contract worker' " includes "the independent contractor personally, the independent contractor's employees, the independent contractor's subcontractors personally, the subcontractors' employees, and so on"]; *Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 528 ["It would be anomalous to allow an independent contractor . . . to recover against the hirer . . . while denying such recovery to an independent contractor's *employee*"].)

other person present at the Lodge when the incident occurred. He was working as a bartender and was in charge of the area where the scaffold was located.

Miller, Gelatini, and Dickinson offered slightly different accounts of what happened next. Miller states he asked Dickinson for a ladder so he could check where in the ceiling he was going to have to run cables for the ATM. Dickinson replied that he did not have a ladder, but that Miller could use the scaffold. Miller states he asked Dickinson if the scaffold was safe, and Dickinson responded that it was and that he used it to change lightbulbs.

According to Gelatini, the scaffold was already in the room where the work would be done. Miller put his hands on the scaffold and yelled to Dickinson, "Hey, is this thing safe?" Dickinson responded, "I don't know." Miller then proceeded to climb the scaffold.

According to Dickinson, Gelatini asked him if Miller could use the scaffold. Dickinson replied, "Does he know how to use it?" and Gelatini responded, "Of course he does because he does this for a living."

The scaffold had four wheels that had to be locked to prevent it from moving while in use. Miller had never used a scaffold before, and did not know that it had wheels or that the wheels had to be locked in order to prevent it from moving. Dickinson did not say anything about the scaffold having wheels or the wheels needing to be locked, and he did not know whether the wheels were locked.

Miller proceeded to climb onto the scaffold. He testified he was not actually moving the ATM while he was on the scaffold, and that he was "just looking at where we can run the line." While getting down off the scaffold he put his hand on the wall, the scaffold shifted away from the wall, and he fell and hit his head. Immediately after the incident, Dickinson took a picture of the scaffold that showed one of the wheels was unlocked.

3

Miller sued the Lodge and Dickinson for negligence and respondeat superior.[2]  In support of his negligence claim, Miller alleged the Lodge owned, controlled, and maintained the scaffolding.  He also alleged:  (1) the defendants negligently permitted, encouraged, or instructed him to use the scaffold; (2) they knew or should have known the scaffold was dangerous, or unsecured, or unsafe; and (3) he was not aware the scaffold was dangerous, or unsecured, or unsafe.  Finally, he alleged that, as a result of the defendants' negligence, the scaffold moved while he was on it, which caused him to fall to the ground and suffer personal injuries.  In support of his respondeat superior claim, Miller alleged Dickinson was an employee of the Lodge, and was acting within the scope of his employment at the time of the incident.

The Lodge and Dickinson moved for summary judgment on the ground that the *Privette* doctrine provides a complete defense to Miller's claim for negligence and his derivative claim for respondeat superior.[3]  The trial court agreed and granted the motion.  Judgment was entered in favor of the Lodge and Dickinson.

Miller timely appealed.

## II

## DISCUSSION

### 1.  Standard of Review

On appeal from the grant of a motion for summary judgment, " ' " '[w]e review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.]

---

[2]  He also sued Gelatini and Tri-Valley Amusement, Inc.  Although they are also defendants in the underlying action, they are not parties to the underlying summary judgment motion or to this appeal.

[3]  The Lodge also argued the respondeat superior claim failed for an additional reason because Dickinson was not acting as its agent or employee when he interacted with Miller.  The trial court did not address this argument, and neither do we.

4

We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717.) "We accept as true both the facts shown by the losing party's evidence and reasonable inferences from that evidence." (*Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, 1036.) " 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish," ' the elements of his or her cause of action." (*Wilson*, at p. 720.)

Because the trial court's judgment is presumed to be correct, Miller (as the appellant) has the burden of affirmatively establishing reversible error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; *Swigart v. Bruno* (2017) 13 Cal.App.5th 529, 535.) Because "we review 'the ruling, not the rationale,' " on this appeal from summary judgment, we may affirm on any basis supported by the record and the law. (*Skillin v. Rady Children's Hospital & Health Center* (2017) 18 Cal.App.5th 35, 43.)

### 2. *The Privette Doctrine and its Exceptions*

The *Privette* doctrine takes its name from *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*), which held that a person or entity that hires an independent contractor to do work generally is not liable for on-the-job injuries to the independent contractor's workers. The doctrine has produced a large body of case law, including 10 cases from our Supreme Court alone: *Privette, supra*, 5 Cal.4th 689; *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 (*Toland*); *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235 (*Camargo*); *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*); *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219 (*McKown*); *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 (*Kinsman*); *Tverberg v. Fillner Construction, Inc., supra*, 49 Cal.4th 518 (*Tverberg*); *SeaBright Ins. Co. v. US Airways,*

5

*Inc.* (2011) 52 Cal.4th 590 (*Seabright*); *Gonzalez v. Mathis* (2021) 12 Cal.5th 29 (*Gonzalez*); and *Sandoval v. Qualcomm Incorporated, supra*, 12 Cal.5th 256 (*Sandoval*). According to our Supreme Court, the rationale for the doctrine is *delegation*.[4]

"[A]t common law it was regarded as the norm that when a hirer delegated a task to an independent contractor, it in effect delegated responsibility for performing that task safely, and assignment of liability to the contractor followed that delegation." (*Kinsman, supra*, 37 Cal.4th at p. 671; see also *Gonzalez, supra*, 12 Cal.5th at p. 54 [noting "strong presumption under *Privette* that a [hirer] delegates all responsibility for workplace safety to the independent contractor"]; *SeaBright, supra*, 52 Cal.4th at p. 594 ["By hiring an independent contractor, the hirer implicitly delegates to the contractor any tort law duty it owes *to the contractor's employees* to ensure the safety of the specific workplace that is the subject of the contract"]; *Tverberg, supra*, 49 Cal.4th at p. 528 ["When an independent contractor is hired to perform inherently dangerous construction work, that contractor, unlike a mere employee, receives authority to determine how the work is to be performed and assumes a corresponding responsibility to see that the work is performed safely. The independent contractor receives this authority over the manner in which the work is to be performed from the hirer by a process of delegation"].) In its most recent

---

[4] In *Privette* itself, and in earlier cases discussing the doctrine, our Supreme Court explained the rationale in terms of the injured employee's entitlement to workers' compensation benefits, and the fact that workers' compensation is the exclusive remedy against an employer for injuries arising in the course and scope of employment. (See *Privette, supra*, 5 Cal.4th at pp. 696-702; *Toland, supra*, 18 Cal.4th at pp. 261, 266-67; *Camargo, supra*, 25 Cal.4th at pp. 1238-1240, 1244-1245; *Hooker, supra*, 27 Cal.4th at pp. 204-206.) Starting with *Kinsman, supra*, 37 Cal.4th 659, our Supreme Court began explaining the doctrine "in terms of delegation rather than workers' compensation." (*Sandoval, supra*, 12 Cal.5th at p. 270.) It has also made clear that the doctrine applies "to a solo independent contractor who has no employees and who has declined to obtain workers' compensation insurance, such that the contractor will receive no coverage for his or her injuries." (*Gonzalez, supra*, 12 Cal.5th at p. 42.)

*Privette* case, our high court explained, "When a person or organization hires an independent contractor, the hirer presumptively delegates to the contractor the responsibility to do the work safely. [Citations.] This presumption is grounded in two major principles: first, that independent contractors by definition ordinarily control the manner of their own work; and second, that hirers typically hire independent contractors precisely for their greater ability to perform the contracted work safely and successfully." (*Sandoval, supra*, 12 Cal.5th at p. 269.) "A presumptive delegation of tort duties occurs when the hirer turns over control of the worksite to the contractor so that the contractor can perform the contracted work. Our premise is ordinarily that when the hirer delegates control, the hirer simultaneously delegates all tort duties the hirer might otherwise owe the contract workers. [Citations.] Whatever reasonable care would otherwise have demanded of the hirer, that demand lies now only with the contractor. If a contract worker becomes injured after that delegation takes place, we presume that the contractor alone—and not the hirer—was responsible for any failure to take reasonable precautions." (*Id*. at p. 271.) In other words, because the hirer delegates to the contractor all tort duties it might otherwise owe to the contractor's workers, the hirer cannot be held liable if those workers are injured on the job.

Thus, "The *Privette* doctrine holds that a hirer generally delegates to an independent contractor all responsibility for workplace safety and is not liable for injuries sustained by the contractor or its workers while on the job." (*Gonzalez, supra*, 12 Cal.5th at p. 40; see also *SeaBright, supra*, 52 Cal.4th at p. 594 ["Generally, when employees of independent contractors are injured in the workplace, they cannot sue the party that hired the contractor to do the work"].) In this case, the Lodge is the hirer, Gelatini is the independent contractor, and Miller is the worker who was injured on the job. Under the *Privette* doctrine, the Lodge is not liable for Miller's on-the-job injuries because we presume the Lodge delegated to Gelatini "all tort duties [it] might otherwise owe [to] contract workers" like Miller, and that "[w]hatever reasonable care would otherwise have

7

demanded of the [Lodge], that demand lies now only with [Gelatini]." (*Sandoval, supra,* 12 Cal.5th at p. 271.)

There are, however, two exceptions to the *Privette* doctrine "that apply where [the hirer's] delegation is either ineffective or incomplete." (*Sandoval, supra,* 12 Cal.5th at p. 271.) The first exception was recognized in *Hooker, supra,* 27 Cal.4th 198 and is usually referred to as the *retained control exception.* It applies if: (1) the hirer retains control over the manner in which the contractor performs the work; (2) the hirer actually exercises its retained control by involving itself in the work such that the contractor is not entirely free to do the work in its own manner; and (3) the hirer's exercise of retained control affirmatively contributes to the worker's injury. (*Sandoval,* at pp. 276-277.) Under this exception, the hirer's delegation of tort duties to the independent contractor can be seen as "incomplete" or "only partial[]" because it retains control over some aspect of the work and actually exercises that retained control. (*Id.* at p. 271.)

The second exception was recognized in *Kinsman, supra,* 37 Cal.4th 659 and is usually referred to as the *concealed hazard exception.* It applies if the hirer is also an owner or possessor of land, and if "the landowner knew, or should have known, of a latent or concealed preexisting hazardous condition on its property, the contractor did not know and could not have reasonably discovered this hazardous condition, and the landowner failed to warn the contractor about this condition." (*Id.* at p. 664, fn. omitted.) Under this exception, the hirer's delegation of tort duties can be seen as "ineffective" because the independent contractor cannot protect its workers against a hazard it does not know about and could not reasonably discover. (*Sandoval, supra,* 12 Cal.5th at p. 271.)

### 3. *The Privette Presumption Applies.*

The recent case of *Alvarez v. Seaside Transportation Services LLC* (2017) 13 Cal.App.5th 635 explained how the *Privette* doctrine affects the parties' respective burdens on a motion for summary judgment. Again, our Supreme Court has held that "[w]hen a person or organization hires an independent contractor, the hirer *presumptively*

8

*delegates* to the contractor the responsibility to do the work safely." (*Sandoval, supra*, 12 Cal.5th at p. 269, italics added.) The *Alvarez* court referred to this as the "*Privette* presumption." (*Alvarez, supra*, 13 Cal.App.5th at p. 642.) It held the *Privette* presumption arises once the defendant establishes the requisite factual foundation—namely, that it hired an independent contractor to perform certain work, and the independent contractor's worker was injured in the course of that work. (*Id*. at p. 644.) Once the presumption arises, the burden shifts to the plaintiff to raise a triable issue of fact as to whether one of the exceptions to the *Privette* doctrine applies, and if it cannot, the defendant is entitled to summary judgment. (*Ibid*.)

Here, the trial court applied the *Alvarez* burden shifting analysis, and found (1) the Lodge met its burden of establishing the *Privette* presumption, and (2) the burden thus shifted to Miller to raise a triable issue of fact as to whether an exception applies. Miller does not challenge this portion of the trial court's decision. We will thus presume that the Lodge delegated to Gelatini any tort duties it might otherwise have owed to Miller, and that the sole issue on appeal is thus whether Miller has raised a triable issue of fact as to whether an exception to the *Privette* doctrine applies.

### 4. *There is No Triable Issue of Fact as to Whether an Exception Applies*

A. The Retained Control Exception

Miller cites *McKown, supra*, 27 Cal.4th at page 222, for the proposition that "a hirer is liable to an employee of an independent contractor insofar as the hirer's provision of unsafe equipment affirmatively contributes to the employee's injury." He contends *McKown* "is on all fours with the present case" and "directly on point" because Dickinson supplied him with a scaffold that was unsafe unless the wheels were locked, but negligently failed to either check that the wheels were locked or tell Miller to do so.

*McKown* is a short decision, and the facts are quite simple. Wal-Mart Stores, Inc. (Wal-Mart) hired an independent contractor to install a sound system in one of its stores, and the plaintiff was an employee of the independent contractor. Installing the sound

9

system involved running wires and installing speakers in the store's ceiling. Wal-Mart requested—but did not direct—that the contractor use Wal-Mart's forklift when performing the work, and the contractor complied with the request. The forklift was missing a chain that secured a work platform to the forklift, and the plaintiff was injured when the platform disengaged and fell to the floor. A jury found Wal-Mart was negligent in providing unsafe equipment and allocated it 23 percent of the responsibility for the plaintiff's injuries. (*McKown, supra*, 27 Cal.4th at p. 223.) Wal-Mart appealed, arguing it was immune from liability under the *Privette* doctrine, and our Supreme Court affirmed.

The *McKown* court began by summarizing its decision in *Hooker*, which recognized the retained control exception to the *Privette* doctrine and which held a hirer could be liable for injuries to an independent contractor's employee if the "hirer's *exercise of retained control affirmatively contributed* to the employee's injuries." (*McKown, supra*, 27 Cal.4th at p. 225, italics added.) The *McKown* court then noted, "Imposing tort liability on a hirer of an independent contractor when the hirer's conduct has affirmatively contributed to the injuries of the contractor's employee is consistent with the rationale of our decisions in *Privette*, *Toland* and *Camargo*, because the liability of the hirer in such a case is not in essence vicarious or derivative in the sense that it derives from the act or omission of the hired contractor. 'To the contrary, the liability of the hirer in such a case is direct in a much stronger sense of that term.' (*Hooker, supra*, 27 Cal.4th at p. 212.)" (*McKown, supra*, 27 Cal.4th at p. 225.) Finally, it held, "*For the same reason*, when a hirer of an independent contractor, by negligently furnishing unsafe equipment to the contractor, *affirmatively contributes* to the injury of an employee of the contractor, the hirer should be liable to the employee for the consequences of the hirer's own negligence." (*Ibid*., italics added.) The *McKown* court thus appears to have viewed the negligent furnishing of unsafe equipment as one way a hirer can exercise retained control over a contractor's work, and later cases have made that clear.

10

In *Gonzalez, supra*, 12 Cal.5th 29, for example, our Supreme Court recently explained its holding in *McKown* as follows: "[W]e did find that the hirer in *Hooker*'s companion case, *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, . . . *exercised its retained control in a manner that affirmatively contributed to the injury* where it required the independent contractor to use the hirer's own defective equipment in performing the work." (*Id*. at p. 42, italics added.) It also explained: "In the nearly two decades following our opinion in *Hooker*, courts have consistently reaffirmed that '[a] hirer's failure to correct an unsafe condition' is insufficient, by itself, to establish liability under *Hooker*'s exception to the *Privette* doctrine. [Citations.] To be liable, a hirer must instead *exercise its retained control* over any part of the contracted-for work—such as by directing the manner or methods in which the contractor performs the work; interfering with the contractor's decisions regarding the appropriate safety measures to adopt; *requesting the contractor to use the hirer's own defective equipment in performing the work*; contractually prohibiting the contractor from implementing a necessary safety precaution; or reneging on a promise to remedy a known hazard—in a manner that affirmatively contributes to the injury. (See *Hooker*, at pp. 212, fn. 3, 215; *McKown, supra*, 27 Cal.4th at p. 225; [citations].)" (*Gonzalez, supra*, 12 Cal.5th at p. 47, italics added.) Even more recently, in *Sandoval, supra*, 12 Cal.5th 256 the Supreme Court cited *McKown* as an example of a retained control case where "affirmative contribution" was found because the "hirer 'requested' that contractor use faulty equipment, thus at least in part inducing the contractor's decision to use it." (*Id*. at p. 277.) Thus, furnishing unsafe equipment is simply one example of exercising retained control, rather than its own separate exception to the *Privette* doctrine.[5]

---

[5] In a footnote, Miller suggests that the negligent exercise of retained control is one exception to the *Privette* doctrine, and the negligent provision of unsafe equipment is an entirely separate exception. For the reasons just stated, we disagree, and find the

Miller argues *McKown* is directly on point. Miller contends that there are triable issues of fact as to whether Dickinson, the Lodge's agent, negligently provided him with unsafe equipment. The unsafe equipment in this case is the scaffold, and Miller concedes that what made the scaffold unsafe was the fact that the wheels were not locked.[6] (He acknowledges in his briefs, for example: "While Miller was on the scaffold, it moved because at least one of the wheels was not locked, causing him to fall and sustain a significant head injury"; "The scaffold here was dangerous to use unless the wheels were locked"; "Dickinson knew the scaffold was not safe to use unless the wheels were locked, yet he said nothing about the wheels and failed to check them"; "The scaffold is clearly unsafe to use if the wheels are unlocked"; and "The failure to ensure that the wheels were locked, or to even tell Miller to check the wheels, . . . created an unreasonable risk of danger and was precisely why Miller was injured.") We find Miller fails to raise a triable issue of fact as to whether the retained control exception applies.

The trial court found *McKown* was distinguishable because the hirer in that case "*specifically requested* the contractor to use [the] hirer's own forklift." We agree. Here, and in contrast to *McKown*, Dickinson did not ask Miller or Gelatini to use the scaffold. At best, he offered the scaffold for use, thereby permitting its use because Miller and

___

provision of unsafe equipment is simply one way a hirer can exercise retained control over the worksite.

[6] Miller also argues the trial court erred in overruling his objection to a defense expert's declaration that the expert inspected the scaffold about seven months after the accident, and "[a]ll component parts were in serviceable condition. To my knowledge, no portion of the scaffold had been repaired or replaced." Miller objected on the grounds that the statement lacked foundation and personal knowledge. Assuming for the sake of argument that the objection should have been sustained, we find the error to be harmless. The Lodge proffered the expert's declaration to refute any argument that the scaffold was defective, but Miller did not make such an argument in opposition to the motion. Instead, he contended that the scaffold was unsafe to use unless the wheels were locked, not that it was unsafe because it was not in serviceable condition or was otherwise defective in some way.

12

Gelatini apparently had no equipment that would allow the necessary access, and "passively permitting an unsafe condition to occur . . . does not constitute affirmative contribution" within the meaning of the retained control exception. (*Tverberg v. Fillner Construction, Inc.* (2012) 202 Cal.App.4th 1439, 1446.)

Miller argues this attempt to distinguish *McKown* is unpersuasive. He contends the evidence shows Dickinson offered him the scaffold in lieu of a ladder, and he analogizes this to Wal-Mart's request in *McKown* that the contractor use its forklift. We find the analogy to be inapt. There is a difference between *asking* a contractor to use your equipment and *allowing* a contractor to use your equipment. Again, "a hirer is not liable under *Privette* where it merely permits a dangerous work condition or practice to exist. [Citation.] This is true even where the hirer knows of the danger and has the authority and ability to remedy it." (*Gonzalez, supra*, 12 Cal.5th at p. 46.) At best, the evidence in this case would support a finding that Dickinson knew the scaffold was unsafe unless the wheels were locked and had the ability to either advise Miller of that fact or make sure the wheels were locked, but that he failed to do so. This is insufficient to hold the Lodge liable for Miller's injuries. Instead, "Something more is required, such as ' "inducing injurious action or inaction through actual direction" ' [citation]; directing ' "the contracted work be done by use of a certain mode" ' [citation]; or interfering with ' "the means and methods by which the work is to be accomplished" ' [citation]." (*Id.* at p. 42.) Here, that "[s]omething more" is lacking because Dickinson did not direct Miller to use the scaffold, he did not direct that the work be done by use of a certain mode, and he did not interfere with the means and methods by which the work was done.

"A hirer 'retains control' where it retains a sufficient degree of authority over the manner of performance of the work entrusted to the contractor," and it " 'actually exercise[s]' " its retained control "when it involves itself in the contracted work 'such that the contractor is not entirely free to do the work in the contractor's own manner.' [Citations.]" (*Sandoval, supra*, 12 Cal.5th at pp. 274, 276.) In *McKown*, Wal-Mart

13

involved itself in the work when it asked the contractor to use its forklift such that the contractor was not entirely free to do the work in its own manner. Here, in contrast, Dickinson did not ask Gelatini and Miller to use the scaffold or otherwise involve himself (or the Lodge) in the work of moving the ATM, and Gelatini and Miller were free to do the work as they saw fit.

*SeaBright, supra*, 52 Cal.4th 590, is instructive. There, the defendant was an airline that hired an independent contractor to maintain and repair a conveyor that it used to move luggage at an airport. An employee of the independent contractor was inspecting the conveyor and was injured when his arm got caught in its moving parts. The employee sued the airline, alleging causes of action for negligence and premises liability.[7] The airline moved for summary judgment based on *Privette* and *Hooker*, arguing it was not liable for the employee's injuries because it did not retain control over the independent contractor's work or exercise the control it retained in a way that affirmatively contributed to the employee's injury. The employee opposed the motion with a declaration from an expert who stated the conveyor's lack of safety guards violated Cal-OSHA regulations and the safety guards would have prevented the employee's injury. The trial court granted the motion, and the appellate court reversed, holding that, under the Cal-OSHA regulations, the airline had a nondelegable duty to ensure that the conveyor had safety guards and that there was a triable issue of fact as to whether the airline's failure to perform this duty affirmatively contributed to the employee's injury. (*SeaBright, supra*, 52 Cal.4th at pp. 594-595.)

---

[7] The lawsuit was initially filed by the independent contractor's workers' compensation insurer, which claimed the airline had caused the employee's injury and which sought to recover the workers' compensation benefits it had paid; the employee intervened in that lawsuit. (*SeaBright, supra*, 52 Cal.4th at pp. 594-595.)

Our Supreme Court reversed, holding the airline "presumptively delegated to [the independent contractor] any tort law duty of care the airline had under Cal-OSHA and its regulations to ensure workplace safety for the benefit of [the independent contractor's] employees. *The delegation . . . included a duty to identify the absence of the safety guards required by Cal-OSHA regulations and to take reasonable steps to address that hazard.*" (*SeaBright, supra*, 52 Cal.4th at p. 601, italics added.) Thus, even though the employee was injured because the conveyor lacked guard rails that were required by Cal-OSHA regulations, the airline was not liable.

This case is similar. In *SeaBright*, the employee was injured because the equipment he was working on lacked safety guards required by Cal-OSHA regulations. Here, Miller was injured because the equipment he was using to perform the work (i.e., the scaffold) was unsafe unless its wheels were locked. Just as in *SeaBright* the airline delegated to the independent contractor the duty to identify the absence of the safety guards and to take reasonable steps to address the hazard, here, the Lodge delegated to Gelatini the duty to identify the fact that the scaffold had wheels and was unsafe to use unless the wheels were locked or the scaffold was steadied in some manner, and to take reasonable steps to address that hazard.

We thus agree with the trial court that the retained control exception does not apply.

B. *The Concealed Hazardous Condition Exception*

Miller also argues the Lodge is liable for his injuries because it failed to warn him of a concealed hazardous condition on its property (i.e., the unsafe scaffold). We disagree.

The concealed hazardous condition exception applies when the hirer is also an owner or occupier of land. In that case, "the hirer as landowner may be independently liable to the contractor's employee, even if it does not retain control over the work, if: (1) it knows or reasonably should know of a concealed, preexisting hazardous condition

15

on its premises; (2) the contractor does not know and could not reasonably ascertain the condition; and (3) the landowner fails to warn the contractor." (*Kinsman, supra*, 37 Cal.4th at p. 675.) Here, the undisputed facts demonstrate the hazardous condition was not concealed, and the exception thus does not apply even if we assume Dickinson knew of the hazardous condition, and Dickinson failed to warn Gelatini and Miller.

"[A] 'concealed' hazard means something specific: a hazard that the hirer either knows or reasonably should know exists, *and that the contractor* does not know exists and *could not reasonably discover without the hirer's disclosure*." (*Sandoval, supra*, 12 Cal.5th at p. 272, italics added; see also *Kinsman, supra*, 37 Cal.4th at p. 664 [describing concealed hazard as one that is *hidden*].) If the hazard is "reasonably ascertainable" to the independent contractor, the hazard is not concealed and the hirer is not liable. (*Kinsman*, at p. 682.)

Here, the fact that the scaffold had wheels was not concealed. Gelatini and Miller could have discovered their existence had they simply inspected the scaffold before Miller climbed onto it. Miller argues that whether a condition is concealed is an issue of fact that cannot be decided on summary judgment. Given the evidence in this case, we disagree.

To create an issue of fact, Miller contends, "It was dark inside the room" where the accident occurred. Presumably his point is that it was so dark the wheels on the scaffold were not visible. Again, a concealed hazard is a hazard "that the contractor does not know exists *and could not reasonably discover without the hirer's disclosure*." (*Sandoval, supra*, 12 Cal.5th at p. 272, italics added.) That the room may have been dark does not establish that Gelatini and Miller could not reasonably discover that the scaffold had wheels unless Dickinson pointed that out—all they had to do to discover the wheels was simply to look at the scaffold deploying adequate lighting.

Moreover, and more importantly, the evidence cited by Miller does not actually support his contention that the room was so dark the wheels were not visible. He cites

16

deposition testimony from Gelatini and Dickinson.  Gelatini was shown a photograph (marked as exhibit No. 2) of a scaffold that was taken at an inspection that occurred sometime after the accident, and he was asked, "Does that appear to be the scaffold that was involved?"  He responded, "I can't tell because it's light out -- dark in that room."  It is unclear whether Gelatini was referring to the room depicted in the photograph or the room where the accident occurred.  Even if we assume he was referring to the room where the accident occurred, however, at best his testimony might prove the room was too dark to tell whether the scaffold depicted in a photograph was the same scaffold that Miller used.  Gelatini's testimony does not create a triable issue as to whether the wheels on the scaffold were visible when Miller used it.

Dickinson's testimony is even less helpful to Miller.  Dickinson was asked whether it was "bright or dark" inside the Lodge on the day of the incident, and he responded there "probably would have been lights on.  But I don't remember."  Dickinson's testimony that he doesn't remember whether the lights were on is insufficient to create a triable issue of fact as to whether Gelatini and Miller could not reasonably discover the scaffold had wheels without Dickinson's disclosure.  (See, e.g., *Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 140 ["It cannot seriously be argued that a partially assembled and unstable scaffold placed over a hard and uneven surface constitutes a concealed danger"].)

Miller also contends the fact that the wheels needed to be locked to safely use the scaffold was not something he and Gelatini could discover without Dickinson's disclosure.[8]  Again, we disagree.  Upon simple inspection, including checking whether the scaffold would move before Miller climbed on it, Gelatini (and Miller) reasonably should have known that the scaffold could move while Miller was on it if the wheels

_____

[8]  In other words, even if the wheels themselves were visible, the concealed hazard was the fact that the wheels needed to be locked.

17

were not locked or the scaffold was not otherwise steadied in some manner. Again, they failed to inspect the scaffold.

Because the alleged hazard in this case was not concealed and was reasonably ascertainable to Gelatini (and Miller), the concealed hazardous condition exception does not apply. Instead, the *Privette* presumption remains unrebutted, and the Lodge delegated to Gelatini any duty it had to protect Miller from hazards associated with using a wheeled scaffold.

## DISPOSITION

The judgment is affirmed and the Lodge shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


             /s/
        EARL, J.


We concur:


     /s/
MAURO, Acting P. J.


     /s/
DUARTE, J.

18

Filed 9/28/22

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RICKY LEE MILLER, JR., | C090751 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2017-00207092-CU-PO-GDS) |
| v. | |
| ROSEVILLE LODGE NO. 1293 et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Christopher Krueger, Judge. Affirmed.

Demas Law Group, John N. Demas, Brad A. Schultz; and C. Athena Roussos for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Ernest Slome and Joann M. O. Rangel for Defendants and Respondents.

1

THE COURT:

This opinion in the above-entitled matter filed September 2, 2022, was not certified for publication in the Official Reports.  For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.


BY THE COURT:


_____/s/_____
MAURO, Acting P. J.


_____/s/_____
DUARTE, J.


_____/s/_____
EARL, J.